OPINION
In this case, Panagouleas Interiors, Inc. (PI) and Anthony Corona appeal from a trial court judgment in favor of Silent Partners Group, Inc. (SPG) and Corona 9/23/98 Mortgage Trust (Corona Trust). After a bench trial, the court found that SPG and Corona Trust were the legal and equitable owners of hotel property located at 330 West First Street, Dayton, Ohio. The court also found Corona and PI in default on a note and mortgage in the amount of $577,409.77, plus interest, at the rate of 18% from September 24, 1999.
In support of their appeal, PI and Corona raise the following assignments of error:
I. The trial court erred in finding that Anthony Corona defaulted under the terms of the note and mortgage by failing to find that Silent Partner prevented Anthony Corona's performance under the terms of the note and mortgage.
II. The trial court erred by finding that Pete Panagouleas defaulted under the terms of the standard conditional commitment agreement or by failing to find that Silent Partner prevented Pete Panagouleas' performance under the standard conditional commitment agreement.
III. The trial court erred by finding that recording the deed in lieu of foreclosure transferred the property to Silent Partner in satisfaction of the outstanding balance on the note and mortgage or by failing to find that Silent Partner was required to go through foreclosure procedures.
IV. The trial court erred by finding that no fraud or unconscionability is present to void the deed in lieu of foreclosure.
After reviewing the record and applicable law, we find that the third assignment of error has merit. Accordingly, the judgment of the trial court will be reversed and this case will be remanded for further proceedings.
 I
As we noted, Corona and PI contend in the first assignment of error that SPG prevented Corona from performing under the terms of a note and mortgage. The testimony at trial disclosed the following facts (most of which were undisputed).
In 1993, Pete Panagouleas purchased a hotel located at 330 West First Street. Pete owned other hotels and also did hotel renovation. Pete's son, Steve, was the president of PI, a hotel-motel renovation business, and worked with his father on various hotel renovations.
By the fall of 1998, the First Street hotel had a long history of negative cash flow and a tax foreclosure was imminent. To avoid foreclosure, Pete agreed to sell the hotel to Anthony Corona. Although Corona had not previously owned or operated a hotel, Pete and Corona had done business together in the past. According to the purchase contract, the sales price of the hotel was $1,500,000. The contract was dated September 11, 1998, but referred to $350,000 that Corona "had paid" to Pete on September 23, 1998. The balance of the purchase price ($1,150,000) was to be paid after remodeling, at the closing of an end loan on the property.
Because Corona did not have funds to purchase the hotel, Corona and Pete brought in Steve Arwady to secure financing. Arwady then contacted SPG to obtain a short-term loan of $350,000. The purpose of the loan was to provide the down payment and to pay tax liens and judgments pending against the property. Corona was then supposed to obtain long-term financing for the property.
On September 14, 1998, Corona and Pete signed a letter outlining terms on which SPG, Corona, and Pete agreed. First, the sale from Pete to Corona was to create a first mortgage of $577,500 on the property, at an interest rate of 15.5%. Monthly payments on the mortgage were $7,621.53 and a balloon payment of $575,410.08 was due one year from funding. SPG was to purchase the first mortgage for $352,015 (later increased to about $370,542), with the proceeds being escrowed and used to clear the title of property taxes and encumbrances. The rest of the proceeds were to be distributed to Pete.
A pre-payment amount of $91,458.36 would be used to service the first 12 monthly mortgage payments. Therefore, Corona would not have to make mortgage payments during the first 12 months of the loan. During that time, however, Corona would have to pay monthly property taxes and insurance, which totaled about $5,000 per month. Upon payment of the balloon, and no defaults, Pete would receive an additional $57,750. The net amount of the balloon payment would then be paid to SPG.
The September 14, 1998 letter also provided in pertinent part that:
 [t]he funding of this loan will be simultaneously consummated with a contract, full assignment of Note and Mortgage and deed in lieu of foreclosure in escrow. Because it is anticipated that Panagouleas will be holding a second mortgage, Panagouleas shall also provide SPG with a discharge of said mortgage to also be held in escrow.
 In the event of a default by Corona, Panagouleas will have 30 days after the interest escrow of $91,458.36 has been depleted to redeem the first mortgage and Deed in lieu of foreclosure. If Panagouleas does not redeem the discharge of the Second mortgage will be recorded. The interest escrow will be drawn upon monthly. However, if Corona should default, Panagouleas will be given notice of the default. SPG will draw $7,621.53 monthly against the escrow until it is depleted. Upon depletion of the escrow Panagouleas shall have 30 days to redeem. If Panagouleas has not redeemed within the 30 day period SPG will record the discharge.
On September 16, 1998, SPG sent Corona several documents which were to be executed and escrowed with Pete's attorney by September 18, 1998. These documents included a note and mortgage, an assignment of the note and mortgage, a standard conditional commitment agreement, a standard payment verification, an agreement to escrow deed in lieu of foreclosure, and a warranty deed.
Subsequently, on September 17, 1998, Corona signed the agreement to escrow a deed in lieu of foreclosure. Parties to this agreement were Corona, as mortgagor; the Corona Trust, as mortgagee; and U.S. Note and Mortgage Co, as escrow agent. SPG established and controlled the Corona Trust. In the general course of business, SPG buys each of its mortgages into a separate trust, identified by the payor's name.The escrow agreement referred to the mortgage between Pete and Corona, and indicated that Pete "had sold" his right in the mortgage to the Corona Trust. The agreement then said:
 [w]hereas Mortgagee and Mortgagor mutually agree that a deed in lieu of foreclosure should be held in escrow pursuant to this Agreement to further induce the Mortgagee to purchase the note and mortgage from the original mortgagee and to provide additional security to the Mortgagee purchasing said note and mortgage.
* * *
 [T]he Mortgagor shall execute and place in escrow with the Escrow Agent a deed in lieu of foreclosure of the Property and all other documents required to record the same. It is understood and agreed that upon default by Mortgagor of any of the terms of payment of the Note and Mortgage, said documents shall, upon demand of the Mortgagee, and upon five (5) days written notice sent Federal Express or similar overnight delivery to Mortgagor at 330 West First Street, Dayton, OH 45405 advising Mortgagor of intent to do so, be released by the Mortgage Escrow Agent to the Mortgagee.
 The Mortgagor may cure any default within said five (5) days period with the Mortgage Escrow Agent. Mortgagor waives all rights to presentment, notice of dishonor, and protest, and any other defense.
Also on the same day, in compliance with the above agreement, Corona signed a warranty deed transferring the hotel property to the Corona Trust. Specifically, the warranty deed stated that:
 [t]his is a deed given in lieu of foreclosure by the grantor, in the original principal amount of $577,500, dated September 23, 1998, and recorded in the Montgomery County Clerk's office on 9/24/98 in Liber 8-5060 of Mortgage at Page E03. It is intended by the parties that this mortgage shall not merge into the fee title herein conveyed and that said mortgage shall remain and continue as a valid and subsisting lien on the premises.
On September 17, 1998, Corona also signed a note and mortgage to Pete in the amount of $577,500. This mortgage was recorded on September 23, 1998.
In the meantime, on September 18, 1998, Pete assigned his rights in the Corona mortgage to the Corona Trust. Pete also signed a standard conditional commitment agreement on the same day. This was the purchase and sale agreement that was required for the purchase of the Corona mortgage from Pete. The parties to this agreement were Pete and the Corona Trust. According to Section 4.01 (Default) of the standard conditional commitment agreement:
 [i]n the event of a default by the Mortgagor [Anthony Corona] under the terms of the Note and Mortgage the Assignor [Pete Panagouleas] may repurchase said debt instrument from the Assignee [Corona Trust] for the balance of Schedule "A" plus any and all accrued interest, late fees, penalties, costs, attorney fees, etc. The repurchase monies (certified funds) must be received by Assignee from Assignor within 30 days of a payment escrow of $91,495.36 being depleted. This payment escrow was simultaneously established with the purchase of this debt instrument to insure the payment of the 12 monthly payments of $7,621.53. In the event Assignor does not repurchase within said 30 days Assignee will record a Deed in Lieu of Foreclosure held in escrow under separate agreement with Mortgagor.
Subsequently, on September 22, 1998, SPG wired about $50,742 into the account of Dayton Title Agency, Inc., as escrow agent. In the letter, SPG indicated that all documents should be recorded by September 23, 1998, to consummate the sale of the hotel and assignment of the mortgage to SPG. Additionally, SPG instructed Dayton Title to use the $52,742 to pay off taxes, court costs, recording fees, and other items in order to close the sale and simultaneous purchase of mortgage. SPG also said the rest of the funds would be available within a few days. From this money, Dayton Title was to pay any remaining taxes, liens, and broker's fee, and was then to transfer the balance of the funds to Pete.
For some reason that is not disclosed in the record, several existing liens and judgments were not paid. However, SPG did send the rest of the funds and the relevant documents were recorded. The funds were also disbursed, although the precise disbursement is not evident from the record.
On September 23, 1998, Pete signed a quit claim deed, transferring his interest in the hotel property to Corona. Pete's assignment of the note and mortgage to the Corona Trust was then filed with the recorder the following day. Pete never recorded a second mortgage on the property, nor did he ever give SPG a discharge of a second mortgage. However, since the title search before closing did not disclose the existence of any second mortgage, SPG let the closing proceed without discharge of a second mortgage.
On September 24, 1998, PI made its first appearance in the proceedings, or at least a document appears in the record with that date. This document is entitled "note and mortgage," and is signed by Corona and by Steve Panagouleas, on behalf of PI. The document stated that it was intended to secure the payment by Corona of $1,050,000 to PI, as mortgagee. According to the testimony, the note was to finance planned renovations to the hotel. However, this document was never recorded, witnessed, or notarized. The renovations were also apparently never made.
Corona began to default on the SPG/Corona Trust note and mortgage agreement almost immediately. Although the Corona Trust automatically received interest payments on the loan from the escrow account, Corona did not pay into the tax escrow account as required. For example, Corona did not deposit the tax escrow money for October, November, and December, 1998. Upon being notified of the problem, Steve Panagouleas advanced about $15,000 in December, 1998, for the tax payments. He again advanced money in February for January's payment. Corona then made the tax escrow payments until July, 1999.
However, Corona did not make the July, August, and September tax payments. Corona was also not able to obtain financing to repay the balloon payment. As a result, the balloon payment was not made on September 23, 1999, as required. Pete was notified of the default, and Steve began to attempt to repurchase the note. (Pete had suffered a severe stroke in May, 1999, and Steve was acting on his father's behalf, through a power of attorney.)
SPG did not receive any money from any party before the grace period expired. Consequently, on October 25, 1999, SPG recorded the deed in lieu of foreclosure. SPG representatives then showed up at the hotel (with guns, according to Corona), ousted Corona, and took possession of the property. Subsequently, Corona and PI filed this declaratory judgment action, asking for a declaration that they did not default on the terms of the short-term loan, and that the deed in lieu of foreclosure did not pass title to SPG and Corona Trust. The trial court disagreed, and held that SPG and Corona Trust were the legal and equitable owners of the First Street property. Additionally, the court entered judgment against both Corona and PI in the amount of $579,409.77, plus 18% interest, from September 24, 1999.
In the first assignment of error, Corona and PI present three issues which allegedly show that Corona was not in default and/or that SPG prevented Corona from performing under the contract. The first issue is whether nonpayment to escrow for real estate taxes is a condition of default. In this regard, Corona and PI rely on ¶ 7 of the note and mortgage, which states that:
 the Mortgagor will pay 1/12 of the taxes with each monthly mortgage payment to be held in an non-interest bearing account by the Mortgagee. The Mortgagee will pay the taxes upon receipt of the tax bill from the Mortgagor. In the event of any shortage in escrow the Mortgagor will provide that to the Mortgagee within two business days or be considered in default.
According to Corona and PI, default does not occur under this provision until the mortgagor pays or tries to pay a tax bill and there is a shortage in escrow. Because no tax bill was ever paid in this case, they claim Corona could not, therefore, have been in default.
SPG makes several responses to this point. First, SPG says that the matter was not raised in the trial court. Second, SPG points out that under ¶ 11 of the note and mortgage, the mortgagor may be declared in default if he "fails to pay an installment of principal and interest, tax payment, or insurance payment within twenty (20) days of due date." SPG further notes that Corona never forwarded a tax bill to SPG or the Corona Trust. And finally, SPG relies on Corona's failure to pay the balloon payment, which would have justified a finding of default in any event.
As a preliminary point, we think Corona and PI mistakenly referred to the mortgagor, rather than the mortgagee, i.e., they meant to say that no default occurs until the mortgagee tries to pay the tax bill. However, even if the correct term were used, the fact is that this matter was not raised in the trial court.
A failure to raise issues in the trial court waives all but plain error for purposes of appeal. See, e.g., Stiver v. Miami Valley Cable Council
(1995), 105 Ohio App.3d 313, 318. We have discretion to consider plain error, but may do so only "`with the utmost caution, under exceptional circumstances, and to prevent a manifest miscarriage of justice.'" Id. (citation omitted). See also, Luckenbill v. Hamilton Mut. Ins. Co. (Aug. 31, 2001), Darke App. No. 15224, unreported, 2001 WL 991957, p. 17.
Exceptional circumstances do not exist in the present case, nor was there any error. Even if the matter had been raised at trial, ¶ 11 of the contract gives the mortgagee the right to declare a default if tax payments are not made within 20 days of the due date. Since the tax installment payments remained unpaid for three months, Corona was clearly in default. More important, Corona defaulted on the balloon payment, as he made no attempt to pay it by the due date or within 20 days thereafter. Consequently, whether the tax escrow payments were also in default is irrelevant.
In their second issue, Corona and PI claim that Corona's failure to perform is excused by SPG's breach of contract. Specifically, they argue that SPG did not discharge judgments against the property with the loan proceeds.
Previously, we have held that breach of an essential contract term may discharge the obligations of the parties to a contract. By the same token, if the defaulting party has substantially performed, the other party is not excused from performing. See England v. O'Flynn (Jan. 11, 2002), Montgomery App. No. 18952, unreported, 2002 WL 27314, pp. 6-7, citing Kersh v. Montgomery Developmental Center, Ohio Dept. of MentalRetardation and Developmental Disabilities (1987), 35 Ohio App.3d 61.
Notably, Corona and PI do not point to a provision in any contract that requires SPG to clear title to the property. The only reference we found in the record is contained in a September 14, 1998 letter from Steve Arwady (the broker) to SPG. In this letter, Arwady says that Corona and Panagouleas will agree to various terms, including SPG's purchase of the first mortgage on the hotel for $352,015. According to the letter, the proceeds were to be escrowed and distributed as follows: "the first funds will be used to clear title of property taxes and other encumbrances so that the mortgage can be perfected in a first position."
After receiving this letter, SPG sent Corona a letter on September 17, 1998, stating that if SPG received all required documentation, it would forward the purchase proceeds to the title company and/or attorney to disburse funds. According to the letter, the first payoff item was to be "all liens, encumbrances, and/or taxes against the property." Consistent with this promise, SPG first forwarded a partial payment of $50,742 to Dayton Title, with instructions to pay off taxes. SPG then later sent the remaining loan proceeds to Dayton Title. The record does not clearly reveal on whose behalf Dayton Title acted. However, the correspondence between the parties does indicate that SPG required a title commitment as part of the loan transaction.
Nonetheless, despite the lack of evidence about who retained Dayton Title, we do not find that SPG breached an essential contract term. To the contrary, SPG performed its part of the agreement by sending the loan proceeds to the escrow agent. If that agent failed to properly pay off liens and judgments, SPG was not responsible — or at least, the record is devoid of any evidence indicating that SPG was responsible. We note that payoff of encumbrances, taxes, and liens would have benefitted both SPG and Corona. Lien priority was obviously important to SPG, since the Corona Trust was going to hold a first mortgage on the hotel property. Likewise, Corona, as purchaser, would have wanted clear title. As we said, that apparently did not occur, but it was not because SPG breached a contractual duty.
The third issue in the first assignment of error raises the claim that SPG breached a duty of good faith and fair dealing in connection with Corona's attempts to repay his debt. In this regard, Corona says that he had lined up financing by forming a partnership with Dr. Patel and Moti Agarwal. Allegedly, SPG acted in bad faith by refusing to provide a firm payoff amount, and by recording the deed in lieu of foreclosure while still negotiating with Agarwal.
In the context of good faith, the Ohio Supreme Court has said that:
 "[a]lthough courts often refer to the obligation of good faith that exists in every contractual relation, * * * this is not an invitation to the court to decide whether one party ought to have exercised privileges expressly reserved in the document. `Good faith' is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties."
Ed Schory Sons, Inc. v. Soc. Natl. Bank (1996), 75 Ohio St.3d 433,443-444 (citation omitted). In Schory, the court commented that while a bank's decision not to finance a transaction left the debtor "scratching for other courses of credit," the bank did not create the "need for funds and was not contractually obliged to satisfy its customer's desires."Id. at 444.
Likewise, in the present case, SPG did not create the need for funds and was not contractually required to satisfy Corona's desires. Corona had a year to refinance the obligation, and the record shows that he made little effort. According to the note and mortgage, payments (including the balloon payment) that were not made within 10 days of the due date incurred a 5% late fee. As a result, the late fee for the missed balloon payment would have been about $28,000. In the event of default, the interest rate also increased to 18%. Since Corona failed to pay on September 23, 1999, the payment due 11 days later would have included the $577,500, plus interest, as well as the $28,000 late fee. Further interest would have continued to accrue. However, on October 25, 1999, SPG provided a payoff figure of $601,919.58. According to amortization tables submitted to the court, the approximate amount due at that time, including the late fee, would have been about $614,162. Notably, this amount reflects an interest rate of only 15.5%, rather than 18%. This figure also does not appear to include around $20,000 that was past due in tax escrow money. Thus, the payoff figures given to Corona were significantly less than what SPG could have charged.
Under the note and mortgage, Corona was in default if he failed to pay the balloon payment within 20 days of the due date. In view of the default, SPG had the right, on behalf of the Corona Trust, to exercise any privilege reserved in the contract and was not obliged to satisfy Corona's desires. Schory, 75 Ohio St.3d at 443-44.
Based on the preceding discussion, the first assignment of error is without merit and is overruled.
 II
The second assignment of error raises the same issues as the first assignment of error, but focuses on SPG's dealings with Steve Panagouleas. For the reasons already discussed, we reject this assignment of error. However, a few additional comments are in order.
After Corona's default, SPG notified both Pete and Steve Panagouleas. At the time, Steve was acting for his father, who had suffered a stroke and could not speak. When Steve expressed interest in repurchasing the note, SPG asked for evidence of his ability to pay. Steve then sent SPG bank statements showing that he had about $400,000 in his account.
Under the standard conditional commitment agreement, Pete Panagouleas had the right to repurchase the note within 30 days after the escrow account was depleted, i.e, he had until October 23, 1999 to complete the repurchase. On October 14, 1999, SPG offered to extend the deadline until November 3, 1999, on the condition that Steve wired $50,000 into SPG's account that day. This money would then be applied to a repurchase, but would be forfeited if SPG were not satisfied in full by November 3, 1999. Steve testified that he chose not to deposit the money. He also never transmitted any money to SPG for the repurchase, either before or after October 23, 1999. As we stressed earlier, SPG and/or Corona Trust did not have to forego contractual rights to satisfy the desires of another party to the contract.
As an additional matter, we note that Pete Panagouleas is not a party to this case. Instead, the only named plaintiffs were Anthony Corona and PI. While Steve Panagouleas acted on behalf of his father, Pete, and is also the president of PI, no connection has been shown between PI and either SPG or the Corona Trust. The only connection of PI to this litigation is an alleged "note and mortgage" that Corona and PI entered into on September 24, 1998, for $1,050,000. The purpose of the note was to pay for renovations to the hotel. However, the note was never recorded, and no renovations were apparently done. An action could possibly be maintained on the note as a contract, but any action would be between Corona and PI, not by PI against SPG or the Corona Trust. The trial court correctly recognized this fact when it found that no contractual relationship existed between SPG and PI.
Accordingly, the second assignment of error is also without merit and is overruled.
 III
In the third assignment of error, Corona and PI challenge the trial court's finding about the deed in lieu of foreclosure. Specifically, they claim that the trial court erred in finding that the deed in lieu of foreclosure transferred legal and equitable title to SPG and Corona Trust. They also contend that the court erred in failing to find that SPG and Corona Trust were required to use traditional foreclosure procedures.
The initial arguments of Corona and PI are ones we have already rejected, i.e., Corona and PI say that SPG prevented them from making timely payments that would have avoided the filing of the deed in lieu of foreclosure. They additionally contend, however, that the deed in lieu of foreclosure improperly operated to deprive Corona and Pete of their equity of redemption.
In this regard, both sides agree in principle that a mortgagor may convey equity of redemption to a mortgagee in a contract executed subsequent to the mortgage. However, they disagree about how that principle applies to the facts of the present case. Corona and PI allege that the waiver or conveyance occurred at the time of the mortgage. In contrast, SPG and Corona Trust argue that the deed in lieu of foreclosure occurred later. They claim the deed was not security for the original note between Pete and Corona, but was instead an inducement for the Corona Trust to purchase the pre-existing note between Pete and Corona.
In Shaw v. Walbridge (1877), 33 Ohio St. 1, the Ohio Supreme Court held that:
 [t]here is no rule of law which prevents a mortgagor from disposing of his equity of redemption to a mortgagee by private arrangement, but courts of equity will not permit a mortgagee to take advantage of his position so as to wrest from the mortgagor his equity, by an unconscionable bargain. The transaction will be jealously scrutinized, but if the agreement is a fair one, under all the circumstances of the case, it will be upheld.
Id. at paragraph 2 of the syllabus. In explaining this concept, the court stressed that:
 [i]t is true that at the time the mortgage is made no agreement can be made to deprive the mortgagee of his right to redeem. * * *
 But it is equally true that he may subsequently part with this right and the rule on the subject may be thus stated: Courts will scrutinize such a transaction, and will not allow the mortgagee to take any undue advantage; he will not be allowed to use his position as creditor to oppress, or to drive an unconscionable bargain. But where such a sale is a fair one, under all the circumstances, it will be upheld.
Id. at pp. 5-6 (citations omitted). See also Hausman v. Dayton (1995),73 Ohio St.3d 671, 677 ("mortgagor may waive right of redemption after mortgage agreement is entered into, provided the agreement is equitable and supported by adequate consideration").
On this point, Ohio law is consistent with the accepted rule that "a mortgagor's equity of redemption cannot be clogged and that he cannot, as part of the original mortgage transaction, cut off or surrender his right to redeem." Humble Oil Refining Co. v. Doerr (1973),123 N.J. Super. 530, 303 A.2d 898, 905. See also, e.g., Restatement of the Law 3d, Property (1997), Section 3.1; 4 Powell on Real Property (1997), 37-305, Section 37.44(1); Russo v. Wolbers (1982),116 Mich. App. 327, 323 N.W.2d 385, 390; Guam Hakubotan, Inc. v. FurusawaInv. Corp. (C.A.9 1991), 947 F.2d 398, 401; Lewis Broadcasting Corp. v.Phoenix Broadcasting Partners (1998), 232 Ga. App. 94, 502 S.E.2d 254; and Lincoln Mortg. Investors v. J.J. Cook (Okla. 1982), 659 P.2d 925.
As explained in Powell on Real Property:
 [t]he parties cannot promise in the original note and mortgage documents to resolve a default in this manner. Any such provision would be an unacceptable clog on the mortgagor's equity of redemption. After default occurs, however, the parties are permitted to resolve their relationship by means of a deed in lieu of foreclosure.
4 Powell on Real Property (1997), 37-305, Section 37.44(1).
In the present case, the trial court did not discuss clogging or equity of redemption. Instead, the court found that because Pete Panagouleas failed to repurchase the note after Corona's default, SPG was entitled to record the deed in lieu of foreclosure. When making this finding, the court cited Shaw, 33 Ohio St. 1.
We think the trial court erred in applying Shaw. Under that case, as we said, no agreement can be made at the time of the mortgage, depriving the mortgagor of his right to redeem. However, that is precisely what occurred here. Specifically, Corona signed the note and mortgage to Panagouleas, the agreement to escrow a deed in lieu of foreclosure, and the warranty deed conveying the hotel property to the Corona Trust, all on the same day (September 17, 1998). On the following day, Pete Panagouleas signed a document assigning the Corona note and mortgage to the Corona Trust. On that day, Pete also signed the standard conditional commitment agreement, which assigned Pete's rights to the Corona Trust, and gave Pete the right to repurchase the note upon Corona's default. The standard conditional commitment agreement also provided that a deed in lieu of foreclosure would be recorded in the event of Pete's failure to repurchase the note.
Without the deed in lieu of foreclosure, SPG would not have provided the financing for Corona to purchase the hotel. In this regard, SPG's Vice President, Lee Carman, testified that Corona and Pete did not agree with the deed in lieu of foreclosure, but that SPG would not do the deal without it.
As we mentioned, SPG argues that the deed in lieu of foreclosure was not security for the original note, but was an inducement for the Corona Trust to purchase the pre-existing note and mortgage. We consider this argument disingenuous. In the first place, since Corona signed all the relevant documents on the same day, there was no "pre-existing" note and mortgage. Moreover, all the documents, including those Pete signed, were executed before the closing on the property and the release of funds. And finally, the facts of the case clearly reveal that all the documents were executed as part of the same transaction.
Under general contract principles, "writings executed as part of the same transaction should be read together." Edward A. Kemmler MemorialFound. v. 691/733 East Dublin-Granville Road Co. (1992), 62 Ohio St.3d 494,499. No matter how the transaction was structured, the fact is that SPG was loaning Corona the money for the down payment on the hotel. As a condition of the loan, SPG required Corona to forfeit his equity of redemption. However, this was not permissible under established law. Compare Lewis Broadcasting Corp., 502 S.W.2d at 256 (option agreement executed as part of a loan transaction is not a "subsequent agreement" and is unenforceable as an invalid restraint on equity of redemption).
Even if we accepted SPG's argument that the deed in lieu of foreclosure was an inducement for SPG to purchase the note from Pete, the result would be no different. Specifically, no new consideration flowed to Corona, who was the party relinquishing the equity of redemption. Additionally, to the extent that the equity of redemption belonged to Pete, no new consideration existed either, since these matters were all part of the same transaction.
Furthermore, the "subsequent agreement" that can circumvent the prohibition against clogging typically occurs only after default. 4 Powell on Real Property (1997), 37-305, Section 37.44(1), and Restatement of the Law 3d, Property (1997), Section 3.1(f) (Illustration 13). A few courts have allowed the prohibition against clogging to be circumvented before default. For example, in Guam Hakubotan, Inc., the mortgagor signed a promissory note in order to purchase real property and secured the note with mortgages on the property. 947 F.2d at 399. The interest payments were made in a timely fashion, but less than one month before the principal was due, the mortgagor told the mortgagee that it would have trouble making the payment. In exchange for a six-month extension, the mortgagor signed a new agreement, deeding the property to the mortgagee in the event of default. Id. at 490. After default, the deed was recorded, and the mortgagor then brought suit, asking the court to void the transaction. Id.
The district court held that the deed was void and that the mortgagor retained its equity of redemption, but the Ninth Circuit Court of Appeals disagreed. To the contrary, the Ninth Circuit Court of Appeals found that the agreement was a valid conditional sale and did not violate prohibitions against alienating the right of redemption. Id. at 401-02. In particular, the Court of Appeals felt that default should not have to occur before a subsequent transaction may be held valid. The court's reasoning was that debtors may benefit from a rule that lets creditors "accommodate their difficulties in repayment prior to default." Id. at 404.
Ohio has not specifically addressed this point, and we need not do so to resolve the present case. If we apply the situation in GuamHakubotan, Inc. to the present case, Corona would have approached SPG near the time of default, and would have asked to refinance or extend the loan. If this set of facts occurred, SPG could have required Corona to relinquish his equity of redemption in consideration for the loan extension. The same situation would also exist if Pete had tried to finance a loan with SPG for the repurchase following Corona's default, and before his own default. However, neither set of facts occurred. To the contrary, no new consideration was given either Corona or Pete in exchange for the waiver of the equity of redemption. The only consideration SPG ever extended was in connection with the original loan transaction, and it was simply the amount of money needed to finance the down payment for the purchase of the hotel.
As a final matter, we note that both sides have discussed Gormas v.Permanent Savings Loan Assn. (Oct. 15, 1984), Butler App. No. CA84-03-035, unreported, 1984 WL 3444. In Gormas, the Twelfth District Court of Appeals upheld a supplemental loan and escrow agreement that was executed at the same time as a mortgage note. Pursuant to the supplemental agreement, the mortgagors executed a deed in lieu of foreclosure and it was placed in escrow. Ultimately, the deed was recorded and its validity was upheld. Id. at p. 2.
SPG contends the present case is factually like Gormas, and that the deed in lieu of foreclosure should, therefore, be upheld. In contrast, Corona and PI say that Gormas is distinguishable, among other reasons, because it did not involve a situation in which the mortgagee accepted the deed for the entire debt. They also rely on the fact that the mortgagee in Gormas was required to return excess funds to the debtor.
After reviewing Gormas, we decline to follow it. In the first place, the facts recited in the opinion are not very clear. For example, the appellate court noted that the supplemental loan and escrow agreement was intended to prevent foreclosure of a mortgage on the property. 1984 WL 3444, p. 1. However, the court did not clarify whether the same mortgagee held both the mortgage in default and the newly financed mortgage. If this were the case, Gormas would be consistent with the doctrine that where the mortgagor is in default, the mortgagor and mortgagee can agree that the equity of redemption may be waived without violating the prohibition against clogging.
There is some indication in Gormas that the mortgage being foreclosed, as well as the new mortgage, did involve the same parties, i.e., the opinion mentions a trial court finding that the supplemental agreement merged the mortgages (plural) on the property with the recording of the deed. Id. at p. 2. Since no other mortgagees were involved in the lawsuit, we could assume that the same mortgagee (Permanent Savings 
Loan) held both the prior mortgage that was in the process of being foreclosed, as well as the mortgage that was negotiated to avoid the foreclosure.
As we said, though, the facts are not clear. If the above assumptions are not correct, then the holding in Gormas would violate the Ohio Supreme Court decision in Shaw, which clearly states that "at the time the mortgage is made no agreement can be made to deprive the mortgagee of his right to redeem." Shaw, 33 Ohio St. at 5. However, due to the murky state of the facts in Gormas, we would not be comfortable reaching this conclusion. For the same reason, we cannot rely on Gormas as persuasive authority. We also note that the Twelfth District Court of Appeals explicitly limited its holding to the precise facts of the case. 1984 WL 3444, p. 4.
Gormas may also be distinguished on other grounds, including the fact that the appellate court did not interpret the supplemental agreement as waiving either the equity of redemption or a sale for two-thirds of market value, as required by statute. In this regard, the court commented that
 [i]f appellee would not have the property appraised and would sell it for less than its two-thirds market value, equity would not enforce such a transaction. * * * Likewise, equity would not enforce appellee's denial of the appellant's equity of redemption.
Id. at p. 3.
To some extent, this latter comment does not make sense, since the effect of a deed in lieu of foreclosure is to deprive the mortgagor of the equity of redemption. In any event, in contrast to the decision inGormas, the effect of the trial court judgment in the present case is to deprive Corona of any equity of redemption. Specifically, the trial court held that SPG and Corona Trust were the legal and equitable owners of the property. As a further contrast, the trial court rendered judgment against Corona (and inexplicably, also against PI, who was not even a party to the note), in the amount of $579,409.77, plus 18% interest, from September 24, 1999.
According to the testimony at trial, the First Street hotel was valued at about $2,000,000 at the time of the original transaction. The trial court judgment vests legal and equitable title completely in SPG and Corona Trust, so that the property belongs to those parties without a need to account for any proceeds of sale above and beyond what is required to satisfy the debt. Further, Corona and SPG were also given a judgment in the amount of the original debt, which they can attempt to recover by levying on other assets belonging to Corona. Admittedly, the hotel may no longer be worth an amount in excess of the debt. Likewise, Corona may have no other assets. Nonetheless, even if we were inclined to follow Gormas, the trial court decision in this case is inconsistent with the court's observation in Gormas that the supplemental agreement did not cut off the equity of redemption.
Accordingly, based on the preceding discussion, the third assignment of error is sustained.
 IV
In the fourth assignment of error, Corona and PI contend that the trial court erred in finding that no fraud or unconscionability was present to void the deed in lieu of foreclosure. The specific point made in this regard is that transferring title of a hotel worth $2,000,000 to satisfy a $570,500 debt is unconscionable. SPG and Corona Trust respond by saying that the record does not contain any evidence that the hotel is worth a significant amount in excess of the debt that is owed. In particular, they focus on the fact that the $380,000 sale price between Corona and Pete was recorded. They also attack the credibility of the appraisal report that was presented at trial.
Due to our resolution of the third assignment of error, we need not address this point. Since the deed in lieu of foreclosure is invalid, foreclosure proceedings must take place and excess proceeds, if any, should be returned to Corona. We express no opinion regarding whether any part of those proceeds may also be claimed by other parties. Accordingly, the fourth assignment of error is moot and will not be addressed.
Based on the preceding discussion, the first and second assignments of error are overruled, the third assignment of error is sustained, and the fourth assignment of error is moot. The judgment of the trial court is reversed and this case is remanded for further proceedings.
FAIN, J., and YOUNG, J., concur.